IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GLENN TURNER,

                    Plaintiff,

         v.

GARY BOUGHTON, T. HERMANS, TIM HAINES,
MR. KARTMAN, CAPT. GARDNER, L. BROWN,
J. SWEENEY, LT. SHANNON-SHARPE, LT. TOM,
B. KOOL, SGT. KUSSMAUL, OFC. MCDANIEL,          OPINION and ORDER
OFC. TAYLOR, CAPT. PRIMMER, CAPT. HANFELD,
ELLEN RAY, WILLIAM BROWN, DR. JOHNSON,             17-cv-203-jdp
MS. LEMIEUX, DR. SCOTT RUBIN-ASCH,
DR. HOEM, MS. MINK, CATHY BROADBENT,
MR. EWING, MR. EVERS, CATHY JESS,
DAN WESTFIELD, EDWARD WALL,
MR. WIESGERBER, DAN WINKLESKI,
and MS. SEBRANEK,

                    Defendants.

Plaintiff Glenn Turner, appearing pro se, is a prisoner at Wisconsin Secure Program Facility (WSPF). Turner has been in solitary confinement, for a combination of administrative and disciplinary reasons, continuously since 2010. Turner alleges that prison officials have violated his rights in several ways related to this long-term segregation. I allowed to him to proceed on constitutional claims about the process he received in reviewing his custody, his conditions of confinement, his medical care, and alleged retaliation against him. Dkt. 31.

The group of defendants represented by the attorney general's office, whom I'll refer to as the "state defendants," has filed a motion for summary judgment. Dkt. 115. The remaining defendant, former Department of Corrections Secretary Edward Wall, has filed his own motion for summary judgment. Dkt. 126.

Defendants think that Turner has persistently engaged in gang-related activity, so they have isolated him to prevent him from disrupting prison order and, perhaps, posing a risk to the safety of others. Turner's long and continuous isolation has surely taken a toll on his mental health, and the court does not endorse indefinite solitary confinement as a basic tool of prison management. But Turner's constitutional due process claims do not afford the court the opportunity to conduct a searching review of prison decision-making about matters of prison security. I am not persuaded that keeping Turner in solitary confinement forever because of oblique references to the Gangster Disciples is necessary, humane, or wise. But the record before me shows that Turner received the limited process that he was due. And it shows that defendants have at least some reasons to believe that Turner persists in gang-related communications.

So, for the reasons explained more fully below, I will grant Wall's motion in its entirety and I will grant the state defendants' motion on all of Turner's claims except one: his Eighth Amendment claim that defendant Angela Mink failed to follow up with him for months on his reports of depression and anxiety. Because Turner is also litigating claims about his mental health treatment in another of his cases in this court, I will sever his claim against Mink from this lawsuit and consolidate it with his claims in his other lawsuit so that all of his mental-health-treatment claims can be litigated together.

PRELIMINARY MATTERS

I begin with several preliminary motions.

## A. Motion for recruitment of counsel

Turner has renewed his motion for the court's assistance in recruiting him counsel. Dkt. 111. Turner says that he has limited knowledge of the law and access to the law library, that the case involves complex issues, and that he is unqualified to represent himself at trial. Turner's lack of legal training is common among pro se litigants and I have not seen evidence that he is more limited than the typical pro se litigant. To the contrary, Turner is an experienced pro se litigator in this court who has conducted trials on his own behalf in this court before. Regardless of his legal knowledge or law library access, his filings in this case, including his summary judgment materials, have been understandable and relatively well-reasoned. I will deny his motion for the court's assistance to help him defend against defendants' summary judgment motions.

Because I am allowing one claim to proceed to trial—an Eighth Amendment medical care claim against defendant Mink—I will consider Turner's motion as it pertains to the trial itself. Any pro se litigant would unquestionably fare better if they had counsel at trial. And I understand that litigating a trial is a substantially more daunting task than responding to a summary judgment motion or submitting other filings. Still, I must consider Turner's capabilities and the complexity of the case. The surviving claim is relatively straightforward and turns primarily on the basic factual question of whether Mink truly did delay in arranging for further mental health treatment. Given the nature of the remaining claim and Turner's experience in this and other cases, including a recent trial, *Turner v. Brown*, No. 17-cv-764-jdp (W.D. Wis), I will deny Turner's motion for recruitment of counsel. Before Turner's claim goes

3

to trial, I will issue a trial preparation order that will provide Turner with more guidance about how to present his claim at trial. If, after reviewing that order, Turner has specific questions about what to do at trial, he should write to the court to ask his questions.

## B. Motion to reconsider three-strikes ruling

Turner has filed a motion for reconsideration of the portion of my March 9, 2020 opinion, Dkt. 104, concluding that he has three "strikes" under 28 U.S.C. § 1915(g) and thus is barred from proceeding in forma pauperis on claims unrelated to a threat of imminent danger of serious physical injury. Dkt. 110. He continues to argue that his cases *Turner v. Murphy*, 93-C-781-S (W.D. Wis. Nov. 16, 1993), and *Turner v. Endicott*, 96-C-881-S (W.D. Wis. Oct. 28, 1996), should not have been dismissed, but it is not this court's role to relitigate the correctness of those dismissals; Turner had an appellate process available for a direct challenge to the judgments. Rather, I was tasked with deciding whether those cases were dismissed for being "frivolous [or] malicious" or for "fail[ing] to state a claim upon which relief may be granted." Section 1915(g). I concluded that Turner's cases were dismissed for being frivolous or for failure to state a claim because of Judge Shabaz's rulings in both cases that "the Court states with certainty that petitioner is unable to make any rational argument in law or fact to support his claim for relief." *See* Dkt. 72-1 and Dkt. 72-2. Nothing in Turner's motion to reconsider persuades me that my strike determinations were incorrect. So I will deny his motion. I note that my three-strikes ruling does not have any effect on this case because Turner has paid the full filing fee. Dkt. 104, at 4.

## C. Discovery motions

Turner filed a motion to compel discovery, stating that defendants did not respond to his first set of discovery requests. Dkt. 133. Defendant Wall says that he did in fact respond,

and Turner doesn't press the issue further regarding Wall. The state defendants note that at the time Turner made his requests, discovery was stayed pending resolution of their motion to dismiss, but that they did respond to the discovery requests after the court's decision on the motion to dismiss. I take it that the state defendants' responses crossed in the mail with Turner's motion to compel. Turner followed with a second motion to compel directly addressing a handful of the state defendants' responses, Dkt. 138, but he did not confer with opposing counsel about the issues he raises before filing his motion to compel, as required under Federal Rule of Civil Procedure 37(a)(1), so I will deny his motion to compel.

Turner has also filed a motion for the state defendants to file with the court two Division of Adult Institutions (DAI) policies, one relating to gangs and one relating to handcuffing policies. Dkt. 137. This is really a motion to compel, and it suffers from the same flaw as his other motion: he didn't confer with opposing counsel about it. I will deny the motion. In any event, the state defendants submitted a copy of an updated version of the handcuffing policy, and the parties discuss how the policy has been changed, so there isn't any prejudice to Turner. And none of Turner's claims boil down to the specifics of the security threat group policy; the ultimate question in this lawsuit is whether defendants violated Turner's constitutional rights, not whether they followed their internal policies. *See, e.g., Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law or, in this case, departmental regulations and police practices.").

After briefing was completed on both motions for summary judgment, Turner filed a motion to compel discovery, Dkt. 168, and an associated motion for sanctions under Federal Rules of Civil Procedure 37 and 56, Dkt. 170. There are two components to these motions.

First, Turner says that defendant Lebbeus Brown lied when he stated in his supplemental declaration that "Turner has never been in GP at WSPF."[1] Dkt. 161, at 1, ¶ 79. Turner submits evidence showing that he was in general population at WSPF from June to November 2008, during a stint at that facility that predates the claims in this case. Turner asks for sanctions against the state defendants under Federal Rule of Civil Procedure 56, stating that Brown's declaration was in bad faith. The state defendants respond with another supplemental declaration by defendant Brown, stating that he did not recall Turner having been in general population but that his review of the records show that he was in fact in general population from June 2008 to March 2009. Dkt. 174. The time in question is immaterial to the claims in this case, there's no reason to think that this misstatement from Brown was anything other than a mistake, and Brown has now corrected it. His misstatement is not cause to sanction the state defendants. I will deny this portion of Turner's motion for sanctions.

Second, Turner asks the court to direct the state defendants to submit a copy of DAI policy No. 306.00.16, relating to contraband. The parties agree that as a DOC security measure, Turner was allowed to view this policy and take notes on it, but he was not allowed to have a copy of it. But in any event, Turner followed by submitting a copy of a 2014 version of this policy that the parties do not suggest departs in a material way from versions of this policy in effect at other times relevant to this case. Dkt. 171-9. So that part of Turner's motions is moot.

---

[1] There are two defendants with the last name Brown in this case. But the only mention of William Brown is as part of a large number of defendants involved in Turner's administrative-confinement reviews. I will refer to William Brown by his full name in this opinion. Lebbeus Brown's actions are discussed in more detail in this opinion, and at times I will refer to him as "defendant Brown."

From Turner's briefing on these motions, it's clear that he cares about the contraband policy because he wants to show that prison staff violated DOC rules by discarding letters allegedly written by him to other inmates in 2010 and 2011 that defendants believed contained coded messages about gang activity, and that were used as evidence against him in a 2011 disciplinary proceeding. Turner brings retaliation and due process claims about that proceeding that I will discuss in more detail below. He asks for spoliation sanctions against the state defendants because the contraband policy says that this type of material should have been retained for 11 years. *See id.* at 2.

The state defendants argue that the destruction of the evidence didn't violate the policy because it says that only "[d]ocuments and photographs" of contraband items must be retained for 11 years, whereas contraband items themselves must be retained for only 120 days. *Id.* This argument makes little sense—the documentation-of-contraband regulation is directed at items discussed in the policy that are not readily capable of being stored for long periods of time, such as needles or other sharp objects, food, fecal matter, and intoxicants. Even then the policy says to take photos of the objects, and those are kept for 11 years. *Id.* I will assume that destruction of the letters violated the contraband rule.

But even so, spoliation sanctions are not appropriate in the absence of a showing that evidence was "destroyed for the purpose of hiding adverse information." *See Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 428–29 (7th Cir. 2010). The parties agree that Turner filed a notice of claim about those disciplinary proceedings, but the state defendants say that prison staff themselves are not typically notified of notices of claim before a lawsuit is filed. Defendants were served with Turner's complaint several years after the events in question. And Turner doesn't provide evidence showing when the letters were destroyed or that anyone who

would have known about the lawsuit, including defendants, were involved with the destruction of the evidence. I will deny Turner's motion for sanctions on this issue. But the evidence that survives—the conduct report itself and defendant Lebbeus Brown's contemporaneous analysis of the letters—discusses only individual passages from Turner's letters. So I will assume that the other parts of the letters did not contain any evidence of coded discussions about gangs.

## D. Motions for extensions of time

Both sides filed motions of extensions of time to file their summary judgment responses or replies. Dkt. 132; Dkt. 154; Dkt. 155. Those motions are granted; I will consider all the summary judgment briefs as timely filed.

## MOTIONS FOR SUMMARY JUDGMENT

I allowed Turner to proceed with the following constitutional claims:

- Procedural due process claims against 28 defendants, including Edward Wall, for participating in administrative-confinement reviews that Turner says were constitutionally deficient.

- Substantive due process claims against defendants Lebbeus Brown, David Gardner, and Michael Hanfeld for falsifying conduct reports and evidence in conjunction with Turner's disciplinary proceedings.

- First Amendment retaliation claims against defendants Lebbeus Brown and Gardner for falsifying conduct reports.

- Procedural due process claims against defendants Gary Boughton, Tim Haines, Larry Primmer, Ellen Ray, Joni Shannon-Sharpe, and Craig Tom for their roles in conducting Turner's disciplinary hearings or reviewing appeals or grievances regarding those hearings.

- Eighth Amendment conditions-of-confinement claims against defendants Boughton, Haines, Troy Hermans, Cathy Jess, Mark Kartman, Jerry Sweeney, Wall, and Dan Winkleski in their individual and official capacities for the conditions of Turner's solitary confinement.

- Eighth Amendment medical-care claims against Stacy Hoem, Tracy Johnson, Maria Lemieux, Angela Mink, Scott Rubin-Asch, and Tori Sebranek concerning Turner's psychological treatment while in solitary confinement.

- Eighth Amendment claims against Boughton, Anthony Broadbent, Lebbeus Brown, Haines, Hermans, Brian Kool, and Ray regarding the WSPF handcuffing policy.

## A. Procedural due process claims for administrative confinement

Turner brings procedural due process claims against 28 defendants for being involved in his various administrative-confinement reviews that have resulted in him being kept in solitary confinement at WSPF since 2010.

### 1. Facts

The following facts are undisputed except where noted. I'll add additional facts relevant to other claims in the sections of the opinion pertaining to those claims.

Turner is currently serving a life sentence for first-degree intentional homicide. He has been incarcerated since the early 1990s and he has been housed at WSPF since September 16, 2010. He has been held in solitary confinement for his entire current stint at WSPF with most of that time being served in administrative confinement.

Administrative confinement is a segregated status for inmates "whose continued presence in general population poses a serious threat to life, property, self, staff, or other inmates, or to the security of the institution." Wis. Admin. Code § DOC 308.01. Inmates' administrative-confinement status is reviewed every six months.

Inmates can also earn their way out of administrative confinement into general population through a program in which their progress and behavior is reviewed every 30 days. That program was previously called the High Risk Offender Program (HROP) but in the last couple of years the name was changed to Progressing through Administrative Confinement Effectively (PACE).

9

While in administrative confinement, Turner is housed in cells about 6 by 12 feet in size. He's confined to the cell for 23 to 24 hours of the day. The cell is illuminated to some degree around the clock, with a night light on when the main light is turned off. The cells have solid steel doors, a concrete slab with a thin mattress, a stainless-steel toilet-sink combination, and a steel desk. This does not leave Turner with much room to exercise or walk around in his cell.

Turner generally receives five hours of out-of-cell recreation time a week, with half of that time in indoor rooms and half outdoors in 14- by 15-foot fenced-in enclosures. That outdoor time is the only time that Turner receives natural light. He receives two to three showers a week. Except for a several-month period when Turner was in the "green" phase of HROP, he has been required to eat all of his meals in his cell.

Inmates in administrative confinement are not allowed to go to congregational religious services. For most of his time in administrative confinement, Turner was allowed three phone calls a month. He is allowed one hour of visitation with family or friends per week, over closed-circuit cameras. Inmates in administrative confinement get one hour and fifteen minutes of time in the law library per week, unless they have a court deadline within 30 days, in which case they get an extra session each week.

Turner says that the administrative-confinement cells are colder than the general population cells in the winter and warmer that the general population cells in the summer. The state defendants say that the computer-monitored ventilation system maintains an average temperature of 68 to 72 degrees Fahrenheit during the cold weather months. Turner says that he gets no more than four hours of sleep a night.

Inmates in administrative confinement are allowed only limited property. The parties dispute whether inmates were allowed electronic devices like a television or tablet during the times in question; Turner says that only since the HROP program was changed to PACE have inmates been allowed electronic devices. Inmates in administrative confinement may order canteen once a week and they may check out library books by writing a request to the librarian. Inmates in administrative confinement have the same access to medical and mental health staff as inmates in general population.[2]

The six-month reviews of inmates placed in administrative confinement are performed by an "Administrative confinement review committee" (ACRC) made up of three members appointed by the warden: one from security, one from treatment, and one supervisor who serves as the hearing officer. *See* Wis. Admin Code § 308.03(1). Inmates are given notice of the reasons that administrative confinement is considered necessary and are given a staff advocate. Inmates have some limited ability to call witnesses and question other witnesses.

Turner had ACRC review hearings In November 2010, April 2012 (Turner was in disciplinary segregation from April 2011 to April 2012), October 2012, April 2013, October 2013, May 2014, November 2014, May 2015, November 2015, May 2016, December 2016, February 2017, August 2017, March 2018, December 2018, June 2019, and January 2020.

After each review the committee issued written decisions summarizing the reasons for keeping Turner in administrative confinement. The committee concluded that Turner

---

[2] Turner objects to some of the state defendants' proposed findings of fact, including the proposed finding that administrative-confinement inmates have the same access to medical care as general-population inmates, on the ground "that defendants cannot present their factual proposition in a way that would be admissible in a court of law." But defendants may support their explanation of how WSPF operates with declarations, just as Turner himself has done.

11

presented a substantial risk of physical harm to staff and inmates and a threat to the security of the prison because he was a leader in a "security threat group"—the DOC's term for a gang—called the Gangster Disciples. The committee noted Turner's homicide conviction and his progressively increasing record of conduct report convictions, many having to do with disrespecting DOC staff and others related to physical violence or gang communications.

For instance, in April 2009, Turner was found guilty of "Group Resistance and Petitions" and possession of contraband. Dkt. 119-20, at 61. A confidential-informant inmate told an officer that he was a member of the Gangster Disciples and that Turner led the Gangster Disciples at Green Bay Correctional Institution, made inmates pay dues out of their canteen funds, and ordered inmates to start fights. A second confidential informant inmate told an officer that he was a member of the Gangster Disciples, and that Turner tried to hold meetings in the gym, calling it "Nation Day." *Id.* at 62. The second informant stated that Turner assigned other inmates positions in the gang. Letters and other written materials confiscated showed that Turner was considered a leader. Officers also found Turner having contraband materials mentioning other security threat groups.

In March 2010, Turner was convicted of group resistance and petitions for writing a letter to another inmate in which he discussed the "Better Growth and Development Organization" and "21st Century V.O.T.E.," organizations that the prison's security threat group coordinator says he knows to be front groups for the Gangster Disciples. *Id.* at 57–58.

In April 2011, Turner was found guilty of group resistance and petitions, possession of contraband, and unauthorized forms of communication. *See* Dkt. 118-1. The conduct report, authored by defendant Lebbeus Brown, the security threat group coordinator, was based on

letters that Turner wrote to other inmates that Brown believed were written in coded language to conceal discussion related to the Gangster Disciples.

In May 2013 Turner was found guilty of threats and disrespect for calling an officer "a fat lying piece of shit" and telling the officer, "When I see you in GP I will knock you the fuck out." Dkt. 119-20, at 51.

In February 2014, Turner was found guilty of group resistance and petitions for a letter in which he discussed organizational leadership philosophies, needing a logbook and "count roster," and how men in the community are "responsible for the safety and protection/well being of the community." Dkt. 119-1, at 7–8. He also used the phrase "Growth and Excelleration," which DOC staff understand to be coded language for the Gangster Disciples. *Id.* at 8.

In September 2016, Turner was found guilty of group resistance and petitions, unauthorized forms of communication, and possession of contraband. Dkt. 119-20, at 43. Defendant Lebbeus Brown had conducted a year-long investigation into Turner's leadership role in the Gangster Disciplines and concluded that Turner had been manipulating a civilian to pass communications between Turner and others involved with the Gangster Disciples, in an attempt to restructure the Gangster Disciples in Wisconsin.

In January 2017, Turner was found guilty of inciting a disturbance for responding to letters that appeared to be asking him for permission to harm someone else. *Id.* at 40.

In January 2018, Turner was found guilty of group resistance and petitions. *Id.* at 37. An officer reviewed a letter addressed to Turner stating in part that "they make it seem like it's against the law to be GD." *Id.* Other letters from Turner contained statements that the officer believed to be coded language. Turner discussed business dealings with a confirmed member of

the Gangster Disciples who was incarcerated at New Lisbon Correctional Institution. *Id.* at 38–39. Turner also discussed being "the primary litigator on the class action suit," which the officer believed meant that Turner would be in charge of the Gangster Disciples on his unit. *Id.* at 38.

In June 2018, Turner was found guilty of possessing or manufacturing a weapon and of endangering safety. *Id.* at 35. In Turner's pillow, officers found a several-inch-long piece of metal that was sharpened to a point on one end.

In May 2019, Turner was found guilty of assault after he was found fist-fighting with another inmate; video of the incident showed the officer that Turner initiated the fight. *Id.* at 33.

In December 2019, Turner was found guilty of group resistance and petitions. *Id.* at 30. The conduct report said that an officer intercepted correspondence between Turner and a DOC-verified member of the Gangster Disciples; they were documents falsely purporting to be submissions in this lawsuit. Turner listed a gang member (who is not a defendant in this case) as a "defendant" on the submission and stated that he sought "sanctions" against him. *Id.* The document stated, "Glenn Turner do hereby submit this official responsive pleading to the respondents-defendants false allegations, lies, deceit, and disruption to all legal procedures, policies, and articles of the G.D. which must be addressed in accordance to the law . . . ." *Id.*

He names the following defendants as having participated in what he calls his "sham" reviews or appeals of those reviews: Gary Boughton, Anthony Broadbent, Lebbeus Brown, William Brown, Todd Evers, David Ewing, David Gardner, Tim Haines, Michael Hanfeld, Stacy Hoem, Cathy Jess, Tracy Johnson, Mark Kartman, Brian Kool, John Kussmaul, Maria Lemieux, Jeremy McDaniel, Angela Mink, Larry Primmer, Ellen Ray, Tori Sebranek, Joni

Shannon-Sharpe, Jerry Sweeney, Mary Taylor, Edward Wall, Dan Westfield, Mark Wiesgerber, and Dan Winkleski.

### 2.  Analysis

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. To prevail on a § 1983 procedural due process claim, a plaintiff must demonstrate that he: (1) has a cognizable property or liberty interest; (2) has suffered a deprivation of that interest; and (3) was denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

The Supreme Court has explained that a prisoner's cognizable liberty interests "will be generally limited to freedom from restraint which . . . imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483–484 (1995). A period of segregated confinement may be "atypical and significant" "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) (holding that a prisoner's confinement in segregation for 240 days may implicate a liberty interest).

Turner's time in segregation has been far longer than 240 days. I have previously concluded that inmates likely have a liberty interest in avoiding continued long-term placement in segregation:

> Indefinite detention in segregated confinement could cause an atypical and significant hardship. . . . Wisconsin does not limit the maximum time that an inmate can spend in administrative confinement. An ACRC merely reviews the inmate's placement every six months, and higher-level DOC officials begin automatically reviewing retention decisions once an inmate has

15

> been in administrative confinement for 12 months or longer. Wis. Admin. Code DOC § 308.04. Because plaintiff is serving three life sentences, this means that he could theoretically remain in administrative confinement for the rest of his life.
>
> I cannot conclude that the Constitution would allow a lifetime of segregated confinement after just one hearing—and with only informal procedural requirements at that. I am also mindful of the Seventh Circuit's recent instruction that "prison officials and judges . . . be alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison." *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015).

*Rodriguez v. Haines*, No. 14-cv-86-jdp, 2015 WL 9296308, at *5 (W.D. Wis. Dec. 18, 2015); s*ee also Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (inmates have due process right to periodic review of administrative segregation placement), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

The state defendants say that Turner is precluded from arguing that he has a liberty interest against being housed in administrative confinement because he already lost on that issue in a certiorari proceeding in the Dane County Circuit Court regarding his May 2014 ACRC hearing. *See* Dkt. 72-5. In that order, the court concluded that Turner had failed to show that the conditions in administrative confinement were harsh enough to create an atypical and significant hardship. *Id*. at 6–7. I do not find the state defendants' argument persuasive, for two reasons. First, although they argue that I have previously ruled that issue preclusion should apply to state court rulings, *see Griswold v. Zeddun*, No. 14-cv-718-jdp, 2015 WL 13022896, at *5 (W.D. Wis. Sept. 15, 2015), the state court decision at issue in *Griswold* wasn't in a certiorari proceeding. Courts have generally not used certiorari rulings as a basis for claim or issue preclusion against a federal-court plaintiff's constitutional claims brought under 42 U.S.C. § 1983. *See, e.g., Wilhelm v. Cnty. of Milwaukee*, 325 F.3d 843, 846 (7th Cir. 2003)

(petition for writ of certiorari in state court does not bar later civil rights action); *Kearney v. Milwaukee Cnty.*, No. 05-C-0834, 2006 WL 3147408, at *5 (E.D. Wis. Oct. 30, 2006) (issue preclusion does not apply to underlying administrative ruling or the circuit court's certiorari ruling).

The second problem for the state defendants is that the certiorari ruling concerned only Turner's May 2014 ACRC hearing, but his claim in this case concerns his protracted and indefinite placement in administrative confinement, which continued long past the events at issue in the certiorari matter. I cannot say that the liberty-interest question was settled for all time in the certiorari proceeding given that one of the major conditions of confinement facing Turner is the sheer length of time he has been forced to live in administrative confinement. So I won't apply issue preclusion to Turner's claims.

Aside from the issue preclusion argument, the state defendants do not contend that they should be granted summary judgment because Turner failed to show that the conditions are harsh enough to create a liberty interest. Although not all of Turner's allegations about the conditions are well developed—for instance, he doesn't explain how cold or hot the administrative confinement cells get—the undisputed fact that he has spent so long of a time in solitary confinement is enough for me to assume for purposes of this opinion that he has been deprived of a liberty interest.

But that still leaves the question whether Turner was deprived of process that he was due. As I explained in screening the complaint, Turner is entitled to only "'informal, nonadversarial due process.'" Dkt. 31, at 9 (quoting *Westefer v. Neal*, 682 F.3d 679 (7th Cir. 2012). This requires some notice of the reasons that prison officials seek administrative confinement, time to prepare for the administrative review, and an opportunity to present his

views to a neutral decisionmaker. *Id.* at 684–85. A prisoner also has the right to a decision supported by some evidence. *Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011).

It's undisputed that Turner has had ACRC review hearings roughly every six months and that he also had monthly "unit team" reviews of his status. The parties agree that the monthly unit team reviews could not in themselves have resulted in Turner's removal from administrative confinement. They instead focus on the six-month ACRC reviews, so those are the reviews that I'll consider directly, although the unit team reviews make up some of the material used by the ACRC in performing its reviews.

Turner phrases some of his arguments as notice problems: he states that the ACRC doesn't actually have the power to remove him from administrative confinement—only the warden or the DAI administrator can do so—and he was never told this. He also states that the ACRC did not tell him how he could "earn his way off of A.C." or what he could do to have his gang-affiliation designation removed. Dkt. 144, at 12.

The state defendants say that Turner's assertion that the ACRC didn't have the power to remove him from administrative confinement is an incorrect reading of the DOC regulations, which state that only nonunanimous ACRC decisions for "placement" are forwarded to the warden for a decision, the implication being that unanimous ACRC votes are indeed decisions under the rule. *See* Wis. Admin. Code § DOC 308.04(8)(d). They add that "[t]he regulation doesn't appear to give any official the right to appeal a unanimous decision by the ACRC . . . to remove an inmate from AC." Dkt. 158, at 4. But Turner submits a declaration from defendant Warden Boughton from another inmate's lawsuit in this court, No. 13-cv-546-bbc, in which Boughton said that the warden and DAI administrator "review[] the committee's decision and make[] their own decisions to retain or release an offender from administrative

confinement." Dkt. 148-33, at 4. This is consistent with § DOC 308.04(11), which says that the warden and DAI administrator automatically review ACRC decisions once an inmate has been in administrative confinement for a year. The evidence supports a reasonable inference that, in practice, the ACRC made a recommendation, but the warden or administrator could adopt or reject it.

Nonetheless, this issue isn't material to the due process analysis. *Westefer* requires that the inmate get notice of the reasons that continued administrative confinement is sought, but it does not specify that the ACRC must have specific authority to make a formal decision rather than a recommendation. More important, Turner does not present any evidence that the warden or DAI administrator made decisions based on anything other than the evidence produced at the hearings and rationales provided by the ACRC. For instance, they did not overrule the substance of any of the ACRC decisions here; the committee voted to keep Turner in administrative confinement every time, and the warden or administrator did not overturn those for substantive reasons (although there is evidence that a couple of his hearings needed to be redone because of violations of administrative code procedures, but that does not create a constitutional due process violation).

With regard to Turner's arguments that the ACRC didn't tell him how he could "earn his way off of A.C." or what he could do to have his gang-affiliation designation removed, those aren't really notice arguments. A prisoner might have a due process claim if he wasn't made aware of what standards were being applied in the decision making, because that would imply that he wouldn't be able to prepare for the review. But that's not what happened here. Wis. Admin. Code § 308.04(2) sets forth the reasons that an inmate may be placed in administrative confinement:

(a) The inmate presents a substantial risk to another person, self, or institution security as evidenced by a behavior or a history of homicidal, assaultive or other violent behavior or by an attempt or threat to cause that harm.

(b) The inmate's presence in the general population poses a substantial risk to another person, self or institution security.

(c) The inmate's activity gives a staff member reason to believe that the inmate's continued presence in general population will result in a riot or a disturbance.

(d) The inmate has been identified as having an active affiliation with an inmate gang or street gang or there are reasonable grounds to believe that the inmate has an active affiliation with an inmate gang or street gang; and there is reason to believe that the inmate's continued presence in the general population will result in a riot or a disturbance.

The ACRC hearing forms include each of these four grounds as a checkbox and also contain a section marked "reason for decision" in which the committee explains its decision. In its various decisions throughout the several years' worth of administrative confinement reviews at issue here, the committee generally, but not always, checked all of boxes corresponding to subsections (a) (behavior or history of homicidal or assaultive behavior), (b) (substantial risk to another person or institutional security), and (d) (gang affiliation that would lead to riot or disturbance). I am not aware of any authority suggesting that a prisoner could bring a due process claim for the reviewing body's failure to explain precisely what type of evidence the prisoner would have to produce to prevail during the review of his administrative confinement.

Turner's core arguments are really about the substance of the reviews, not the process. He contends that the ACRC uses what he believes is incorrect and outdated information about him having a gang affiliation that he cannot challenge. And he says there is no formal process for him to renounce his purported gang affiliation so that he will be considered for general population. In other words, the reviews are useless formalities that he will always lose.

20

But it is not this court's role to decide whether Turner is actually a danger to others or whether he is a member of the Gangster Disciples. The due process question is whether the administrative-confinement decisions are supported by "some evidence." The Court of Appeals for the Seventh Circuit has described this standard as a "meager threshold." *Scruggs v. Jordan*, 485 F.3d 934, 941 (7th Cir. 2007). The "evidence must bear some indicia of reliability," and if it does, then a federal court will not reverse the decision. *Id.* This standard "is less exacting than the preponderance of the evidence standard, requiring only that the decision not be arbitrary or without support in the record." *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999) (citations omitted).

The standard may be deferential to prison officials, but "the periodic review must still be meaningful and non-pretextual." *Isby v. Brown*, 856 F.3d 508, 528 (7th Cir. 2017). The reviewing body can't just issue rote decisions relying on old evidence that does not account for changes in a prisoner's behavior or circumstances. *Id.* (periodic review of segregation placement may not satisfy due process if it consists only of "two boilerplate sentences" and fails to consider updated circumstances); *see also Proctor v. LeClaire*, 846 F.3d 597, 611 (2d Cir. 2017) ("It is inherent in *Hewitt's* use of the term 'periodic' that ongoing Ad Seg reviews may not be frozen in time, forever rehashing information addressed at the inmate's initial Ad Seg determination. . . . prison officials must look to the inmate's present and future behavior and consider new events to some degree to ensure that prison officials do not use past events alone to justify indefinite confinement.").

Turner argues, in essence, that he is frozen in time because he no longer poses a threat and he is being kept in administrative confinement on the basis of outdated evidence. In particular, he continues to be labeled a gang member even though he says that is no longer true

(or perhaps never was true), and that he is labeled as violent even though his homicide conviction was 30 years ago and he has been in only two physical altercations with prisoners or staff over the last 15 years (in 2004 and 2019).

The state defendants counter that Turner continues to take part in disruptive and threatening behavior and he continues to be involved in gang-related activity. The ACRC hearing reports reflect Turner's ongoing activity: they are not rote decisions relying solely on old evidence. They contain detailed histories of Turner's transgressions, including his conduct report history, which has continued with minimal interruption over his decades in prison. Turner is correct that the decisions continually refer to his homicide conviction and decades-old disciplinary decisions and gang-related activity, but the older material is only part of the entire history represented there. Turner continues to rack up infractions: over the time of the events of this lawsuit spanning about ten years, Turner has conduct-report convictions for gang communications in 2010, 2011, 2014, 2016, 2018, and 2019. He also has conduct report convictions for disrespect and disruptive conduct in 2010, threats and disrespect in 2013, inciting a disturbance in 2017, making a weapon in 2018, and assaulting another inmate in 2019. The reports also refer to the monthly unit team reviews, in which Turner was frequently noted as being disrespectful to staff.

Turner says that administrative confinement isn't meant to be used to sanction prisoners who are merely disrespectful to staff. I agree with Turner; being disrespectful is not one of the grounds listed in Wis. Admin. Code § 308.04(2). But his long and continuing history of infractions for gang communications, along with his other infractions tied directly to violent behavior like assault or fashioning a weapon are easily "some evidence" supporting his placement in administrative confinement. Turner cannot succeed on a due process claim

predicated on the failure to provide him with meaningful, non-pretextual review of his administrative confinement or the lack of evidentiary support for the decisions.

Turner argues that he isn't a gang member and he blames the DOC for failing to have a mechanism for him to renounce his gang affiliation, but *Westefer* or other similar cases do not give him a due process right to a gang-renouncement procedure. And the record here shows that formal renouncement is not the issue—Turner continues to be convicted of participating in gang communications. The state defendants say that "[t]he simple way to renounce gang affiliation in a credible way is to cease gang activity." Dkt. 158, at 3. Turner says that he is not involved in gang activity but his disciplinary convictions say otherwise. This court does not provide a forum to re-litigate whether he was wrongfully convicted of gang communications; review of the ACRC process under federal law is limited. I will grant summary judgment to both sets of defendants on this claim because Turner was provided the process he was due under federal law. If Turner believes that he is being wrongfully accused of gang communications in the future, he can use the DOC's appellate procures and seek certiorari review in state court. *See State ex rel. Curtis v. Litscher*, 2002 WI App 172, ¶ 12, 256 Wis. 2d 787, 650 N.W.2d 43 ("Certiorari is the well-established mode of judicial review for inmates . . . who seek to challenge prison disciplinary decisions.").

I also allowed Turner to proceed on claims that he was not allowed access to his entire conduct report file before his six-month reviews, including some of the evidence detailing his alleged gang ties, because that could support claims that Turner was unable to adequately prepare for his hearings or present his views about his gang-affiliated status.

At several ACRC reviews from 2015 to 2018, he asked for his "entire case file" and he asked for various prison officials to testify as to why they had previously concluded that he was

a gang member. *See* Dkt. 148-8. Those requests were denied, but Turner does not show how he was harmed by those denials. Turner's gang membership was a matter of longstanding disagreement between Turner and prison staff, and his initial designation as a gang member wasn't something that was relitigated at each six-month hearing, so it's unclear why he would need testimony about that determination. The ACRC decisions during that time were based in part on Turner continuing to receive disciplinary conditions supporting the determination that he is a gang member: he was convicted of gang communications in 2014, 2016 and 2018, and of inciting a disturbance in 2017. So there was fresh evidence supporting the view that Turner was a gang member; Turner took part in all of those disciplinary proceedings. Because Turner has not presented evidence that could support a reasonable jury verdict that he was unable to adequately prepare for his hearings or present his views about his gang-affiliated status, I will grant summary judgment to both sets of defendants on this claim.

Turner also contends that some of his reviews were sometimes more than six months apart, which he calls a "jurisdictional" problem. I take him to be saying that he should have immediately been sent to general population once an ACRC review was overdue. But as I previously explained to him, he cannot bring due process challenges based on violations of state regulations. Dkt. 31, at 10. Cases such as *Westefer* do not suggest that the Constitution requires the reviews to occur within six months of each other, so this cannot support a due process claim either.

## B.  Due process and retaliation claims for disciplinary segregation

Turner also brings claims that his long-term solitary confinement was lengthened by two convictions in disciplinary proceedings that were brought for retaliatory reasons and that violated his due process rights.

1. **Facts**

   a. **2011 conduct report**

Turner says that in 2010 and 2011 he was part of an effort to encourage prisoners to join a statewide class-action lawsuit about the Wisconsin Parole Commission being coordinated by groups called Prison Action Milwaukee and Wisconsin Parole Class Action.

Defendant Lebbeus Brown says that staff monitored prisoners' mail in late 2010 and 2011 in an effort to investigate members of the Gangster Disciples. At the time in question, Brown was a "security threat groups coordinator" at WSPF. The duties of that job included tracking disruptive groups and their members in the prison and documenting their activities, reviewing incoming and outgoing mail and property for gang-related content, and instructing WSPF staff regarding gang identification and gang management strategies. Brown has received training on the identification and operations of prison and street gangs, and he is familiar with gang codewords, lingo, nicknames, symbols, and communication techniques.

On Feb. 1, 2011, Turner's property was confiscated by defendants Brown and Gardner in conjunction with an investigation. Several days later, Brown, Gardner, and defendant Broadbent pulled Turner out of his cell to ask him question about words and phrases used in other inmates' letters, such as "statewide class action," "lawsuit," and "Fourteenth Amendment." Turner responded that those were words used in litigation. Turner says that they did not ask him anything specifically about the Gangster Disciples. Defendants wanted Turner to "interpret" more letters from other prisoners. Turner refused. Brown told officer to "take him to Alpha [unit] for refusing to cooperate." Defendants agree that they confiscated Turner's materials and interrogated him about terms used in other inmate's letters. They say that they did ask him about the Gangster Disciples.

On March 29, 2011, defendant Brown issued, and defendant Gardner approved, a conduct report against Turner charging him with group resistance and petitions, possession of contraband, and unauthorized forms of communication. Brown discussed 12 letters that they say Turner had written to other inmates in December 2010 and January 2011 that Brown, the prison's security threat group coordinator, thought were written in coded language to conceal discussion related to the Gangster Disciples. Turner suggested that the letters were fabricated but he also said that the correspondence was part of his legitimate class-action lawsuit efforts.

Brown's conduct report detailed about 20 statements that Turner purportedly made in those letters, some of which referred to a lawsuit, although not with any specifics. They also included the following, which I've chosen as the statements that seem most out of place in a document discussing a lawsuit:

> "I continue to strive and struggle in the Vision . . . I also wanted to touch basis with you on a common vision and cause we share and call for your assistance in developing, building and realizing what we both know to be Right."

> "You and Fatts are the only two brothers on that end that # 1 I trust, and #2 has shown over the years a constant level of realness that I respect and honor" . . . "To be honest I don't see no more than 15 solid guys in each spot" . . . "And the vision is primary focus on this end"

> "the demo is called 'The Visionary Club' Its a member only type fo dig me . . . something akin to the ancient freemasons moor science temple of America, Nation of Islam, lion Club, Grey Panthers, ect. . . . The difference here is membership does not deal with or anything to do with religion. It's specifically for those that share the vision feel me?"

> "He disrespected Everybody, me specifically and continues to in my view and opinion to dishonor LBH."

> "Tell main man to focus on face cards, PRC, material and JOC's (judgment of convictions)."

> "Its been brought to my attention that one feels that ole fluke
> should be addresses for quacking in re: loco peep scene" . . . "but
> that duck shit is null and void with or without the faith and
> support of those that allegedly don't fuck wit' fluke. The issue will
> be addressed."

Dkt. 118-1, at 13–15.

In the report, Brown said that these remarks show that Turner was interested in recruiting and organizing Gangster Disciples members in several Wisconsin prisons. Brown said that "The Vision relates to how Larry Hoover wanted the Gangster Disciples to operate." *Id.*, at 13. He said that the focus on judgments of conviction and face cards was to check paperwork of potential new members for sex offenses and evidence that an inmate has "snitched" by testifying against other inmates. He added that "LBH" refers to Larry Bernard Hoover, a leader of the Gangster Disciples. He said that the statement about "fluke" and "loco" had to do with other gang members questioning Turner (whose nickname was Fluke) about snitching in a 2003 case involving an inmate nicknamed Loco.

Brown also stated that Turner was found in possession of four magazines with labels removed (which meant that officials could not tell who owned the magazine, in violation of prison rules), two pieces of paper with a number-alphabet code, and what Brown called paperwork related to background checks for three inmates.

Defendant Lieutenant Tom was the hearing examiner for the disciplinary proceeding. Tom was appointed by Gardner, who was acting as the security director's designee. Turner read his own statement that his communications were not gang related, he had never been a Gangster Disciple, DOC doesn't allow prisoners to renounce gang affiliation once staff associates them with a gang, and that because of his background he thought that he could "reach out to the youth." *Id.* at 17. Turner submitted three pages of evidence: DOC documents

showing state officials using the word "vision," and two documents related to the proposed class action. Turner called an inmate witness who said that Turner had never asked him about joining the Gangster Disciples or asked for documents verifying his criminal convictions. Turner presented questions to be asked to defendant Brown, who answered that participating in lawsuits or asking for legal help doesn't mean that inmates are involved in gang activity, but that he believed that the statements in Turner's letters were meant to conceal gang communications. Brown also submitted an "expert report" reiterating the statements he pulled from Turner's letters and briefly explaining why he thought they were gang communications, given his training and experience as security threat groups coordinator.

Tom found the inmate witness's testimony not credible because it seemed rehearsed, and he found Brown's testimony credible because of his training and knowledge of security threat groups. In his declaration, Tom says that he relied heavily on Brown's gang expertise because Tom has limited training in security threat groups. Tom also noted that Turner had been convicted of similar activity in the past. Tom sentenced Turner to about a year in disciplinary segregation. Defendant Captain Primmer denied his appeal. Turner filed a grievance about the proceedings, but defendants Ellen Ray and Warden Tim Haines denied it.

### b.  2014 conduct report

In January 2014, non-defendant officer Demo issued Turner conduct report No. 2381631 for group resistance and petitions, stating that an outgoing piece of mail from Turner to a non-incarcerated family member named Johnny McAdoo contained security threat group material. *See* Dkt. 119-1. The parties do not provide the letter, but the conduct report includes various passages, including the following (which Turner does not dispute):

"The employees/adherents of any group looks to its immediate leadership . . . for an example of how to live in reality what the concept or teachings advocate in print."

"Providing oversight is allowing others to do their part with the leadership checking the form in which the job is being done and the results that comes there from. Never assume that cats 'already know' what to do or how to do it.'"

"When we know better we do better. Those who choose not to, undermines the growth and excelleration of the people and community."

"[Weekly meetings are] necessary for a number or reasons. Not only to address the issues concerning the corporation but also to give the Body an assurance that The Business is Real! And it's being taken seriously at all. It also shows those present who's with them and who's against them."

"The men in the Community is responsible for the safety and protection, well being of the community. The women do their part as well. The kids should never live in fear in the neighborhood they live in. if the playgrounds aren't safe for the kids to play in, if the block and alleys aren't safe for the people to walk down. Then that community is lawless. And no community is manned and controlled by True Men of Honor should be anything but safe for the people who live in it, particularly the kids."

*Id.* at 6–8.

Demo stated that the letter was meant to communicate leadership and organizational principles to a gang on the outside and that while much of the language "would appear to be a regular business corporation model setup," a non-gang organization wouldn't "be concerned [with] who their allies were and establishing that all men in the corporation are responsible for the safety and protection of the community, from street by street and block by block." *Id.* at 8. Turner says that the letter simply explained how to establish and operate a community outreach non-profit corporation.

Before writing the conduct report, Demo gave it to defendant Lebbeus Brown, the security threat groups coordinator, for review. The state defendants say that defendant Brown helped Demo assess the letter, and that defendant Gardner reviewed and approved the conduct report. Turner says that defendants Brown and Gardner had placed him on "mail monitoring" at the time, meaning that they would have reviewed the mail anyway, not correctional officer Demo. Either way, the parties agree that Brown and Gardner had a hand in this conduct report being approved.

The disciplinary hearing on this conduct report was held on February 10, 2014. Defendant Lieutenant Joni Shannon-Sharpe was the hearing officer. Defendant Brown was not called to testify at the conduct report hearing. Turner did not request any witnesses.

Turner prepared a statement for the hearing saying that he went to college for business management and those are the principles he tries to apply to better the outside community. He also submitted documents from a community outreach program that he says his letter was referring to, and Wisconsin statutory sections on corporations and the table of contents from a business management textbook, all referring to concepts such as organizational structure, regular and special meetings, and keeping members' lists at meetings. Turner also submitted a 2002 decision in a state certiorari case in which a circuit court reversed a disciplinary conviction against an inmate for "disrespect" for calling a correctional officer a "'piece of walking, talking dog crap'" in a letter to the inmate's parents. *Id.* at 25.

At the hearing, by which Turner appeared through videoconference, Turner says that Shannon-Sharpe said, "I don't see anything gang related about this letter. I don't see anything about the gangster disciples in it. Or anything criminal." Dkt. 147, at 34, ¶ 220. Shannon-Sharpe rolled her chair out of the view of the video camera and was handed a piece of paper.

When Shannon-Sharpe appeared back in view, she held up the paper but Turner couldn't read it on his monitor. Shannon-Sharpe said, "I was just given this report, and based upon this report, you admitted you are a gangster disciple, and the document is gang related. So I have no choice but to find you guilty." *Id.* at 35, ¶ 221. Turner asked where Shannon-Sharpe got this report from and who was in the room with her but she did not answer.

The parties now agree that this document was a report by defendant Captain Michael Hanfeld, a security threats group specialist, stating that Turner "has openly admitted to being a member of the Security Threat Group 'Gangster Disciples.'" Dkt. 119-1, at 31. Hanfeld also said that the letter to McAdoo was meant to provide "guidance as to how the Gangster Disciples should be organized and structured out on the streets," and that Turner "details how those in leadership roles should model themselves and provide oversight to the membership by training, grooming, and educating them." *Id.* Hanfeld noted that Turner used the phrase "'growth and excelleration'" as a synonym for Growth and Development which is an organization set up by the Gangster Disciples and used as a facade to appear as a community betterment organization." *Id.* Turner says that he has never told anyone that he is a member of the Gangster Disciples.

Shannon-Sharpe's decision says that she considered the statement in the conduct report, Turner's letter, Hanfeld's report, and Turner's statement and evidence. She found Turner guilty, stating that the DOC "recognizes [Turner] as a confirmed member" of the Gangster Disciples, and adopting Hanfeld's analysis of the letter. *Id.* at 9. He received 120 days of disciplinary segregation as a punishment. Defendant Hermans affirmed the conviction on appeal. Defendant Boughton dismissed a grievance that Turner filed.

## 2. Analysis

### a. 2011 conduct report

Turner brings retaliation claims under the First Amendment and substantive due process claims against defendants Lebbeus Brown and Gardner for falsifying the 2011 conduct report and evidence in support. Turner's substantive due process claims largely depend on the validity of his retaliation claims, as a falsified conduct report can support a substantive due process claim only "if the charges were in retaliation for the exercise of a constitutional right." *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994).

Generally, a retaliation claim has three elements: (1) the plaintiff engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was a "motivating factor" in the defendants' decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the plaintiff makes this showing, the burden shifts to defendants to show that they would have taken the same action even without the retaliatory motive. *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). In considering a retaliation claim, the court must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (internal quotations and citations omitted); *see also Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (citing *Babcock*).

It's undisputed that Turner received the conduct report for his communications, some of which were, at least on their face, about filing a class-action lawsuit, an activity protected by the First Amendment. He was punished following his refusal to assist defendants with

"interpreting" other inmate letters that appear to have been related to the lawsuit as well. And the state defendants do not contend that a year of disciplinary segregation wouldn't deter a person of ordinary firmness from making similar communications in the future.

So the decisive question is retaliatory intent. Defendants ask the court to extend the holding of *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), to this case. In *Nieves*, the Court held that a claim for a retaliatory arrest is defeated by a showing that the officer had probable cause to arrest the suspect, unless there is evidence that similarly situated individuals were not arrested for similar conduct. *Id.* at 1727. Defendants say that prison discipline is similar to law enforcement, and that the same concerns that motivated the Court in *Nieves* apply here. But I've already rejected this argument in a similar recent case because Nieves didn't overrule any case law from this circuit regarding the legal standard for a retaliation claim in the prison context. *See Wright v. Funk*, No. 19-cv-37-jdp, 2020 WL 4219845, at *3–4 (W.D. Wis. July 23, 2020).

Nonetheless, my decision in *Wright* is instructive for another reason. I reasoned that regardless of retaliatory motive, a plaintiff couldn't maintain a retaliation claim for a conduct report given for legitimate reasons. *Id.* at *4 (claim that officers retaliated against inmate for threat to file a grievance for failing to intervene in self-harm attempt failed because officers had evidence supporting the conduct report for lying about the amount of medication he took and misuse of medication). *See also Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015) ("it is irrelevant if [a prison employee] may have had a retaliatory motive" if the defendant's conduct "is supported by a legitimate reason." (citing *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009), and *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005))).

Defendants say that they had a legitimate reason for punishing Turner: his letters were coded gang communications. Turner says this is incorrect, that they knew the conduct report was false, and that their true purpose was retaliation. As explained above regarding the spoliation issue, I'll assume that other than the quoted statements, nothing else in Turner's letters is related to gang communication. The quoted statements provided by defendants are not explicitly gang communication, and Brown's discussion of these statements in the conduct report materials is relatively cursory. I understand why Brown, if he thought Turner was a member of the Gangster Disciples, would assume LBH stood for Larry Bernard Hoover. Turner's statements seem out of place in lawsuit-related communications, but it's not clear how Brown knows that statements about "the vision" or "the Visionary Club" are actually about the Gangster Disciples. Nonetheless, the court generally defers to prison officials on matters of prison security. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)) ("Courts must "afford[] considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *see also Koutnik v. Brown*, 456 F.3d 777, 785 (7th Cir. 2006) (deferring to prison staff's assessment regarding gang symbols).

The bottom line for Turner's retaliation and substantive due process claims is that the question isn't whether defendants came to a correct decision about the true purpose of Turner's letters, but rather whether there was a legitimate reason for them to pursue the conduct report. The evidence provided in the conduct report, Turner's history of gang activities, and the undisputed facts about Brown and Gardner asking Turner to interpret other inmate letters lead to only one reasonable inference: defendants believed that Turner and others were involved in gang communications. Turner doesn't present any evidence to show that defendants actually

held animus toward Turner's legitimate participation in the class-action lawsuit, rather than punishing Turner's use of letters about a lawsuit as a front for gang communication. Even if defendants were ultimately wrong about the true purpose of Turner's letters, defendants do not violate the Constitution merely by making errors in disciplinary proceedings. *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016) (adverse act because of "mistaken belief" does not violate First Amendment); *Williams v. Brown*, No. 17-cv-11-bbc, 2017 WL 782958, at *2 (W.D. Wis. Feb. 28, 2017) (no First Amendment retaliation claim against officer who gave conduct report for prisoner who failed to give officer information about an assault; "even if it is true that [the prisoner] had no information to give and [the officer] believed mistakenly that [the prisoner] was lying, a mistake is not a First Amendment violation"). Turner's evidence might raise a dispute about whether he was actually speaking in code about the Gangster Disciples, but he does not adduce any evidence to show that defendants did not sincerely believe that he was doing so. The evidence before the court shows that defendants had a legitimate purpose to issue the conduct report. I'll grant the state defendants' motion for summary judgment on these retaliation and substantive due process claims against defendants Brown and Gardner.

Turner brings procedural due process claims against defendant hearing examiner Tom and defendants Primmer, Ray, and Haines, who reviewed Tom's decision on appeal or in his grievance. As with Turner's claim about administrative confinement, he was entitled to only informal, nonadversarial due process with his disciplinary proceedings. I granted Turner leave to proceed on procedural due process claims against defendant Tom, because Turner alleged that Tom completely disregarded or rejected the evidence he attempted to bring, without any justification, and Tom found him guilty without any evidence. I stated that those allegations

suggested that suggested that Turner did not truly have the opportunity to present his views, that Tom was biased against him, and that Tom did not even have "some evidence" to convict him. But Turner's allegations fall apart at summary judgment.

Turner says that defendants broke DOC rules by having Gardner appoint Tom as the hearing examiner instead of the warden doing so as contemplated by DOC rules. But even assuming this is so, a violation of DOC procedural rules doesn't mean that Turner's constitutional rights were violated.

Turner says that Tom did not give him all the evidence that was used at the hearing, such as copies of the letters in dispute or Brown's expert report. But Turner doesn't have a due process right to review the evidence against him. *Terry v. Stolworthy*, 669 F. App'x 803, 805 (7th Cir. 2016) ("the Constitution does not require the prison to supply Terry with its evidence or other formalities associated with an adversarial hearing"; *Turner v. Winleski*, No. 20-cv-686-bbc, 2020 WL 7122857, at *2 (W.D. Wis. Dec. 4, 2020) ("plaintiff had no constitutional right to question witnesses or review evidence."). Turner says that Tom didn't ask all of the questions he wrote for witnesses, but he did "not have a constitutional right to call witnesses or to require prison officials to interview witnesses" in his hearing. *Westefer*, 682 F.3d at 685.

Turner says that Tom stopped the hearing early, saying "I have to read these letters first I'll be back," and then didn't come back. Turner says this shows that Tom didn't read the letters. But Tom's statement is evidence that he did read the letters before ruling, Tom confirms that he examined all the evidence, and Turner doesn't present evidence showing otherwise. And Turner doesn't suggest that by stopping the hearing that Tom cut Turner off from offering his evidence; the record shows that Tom accepted and considered the evidence Turner offered

except for written statements from other inmates for which he did not request pre-approval as required by DOC rules.

Turner contends that Tom was simply incorrect to believe defendant Brown over him, and that there wasn't evidence to convict him. The evidence here was not especially strong, at least without more explanation from defendant Brown how he knew that particular language was really gang code. But the "some evidence" standard is a "meager threshold," *Scruggs*, 485 F.3d at 941, and Brown's testimony given his experience and training as the security threats group coordinator, and Turner's history of Gangster Disciple-related incidents, is enough in this instance.

In summary, Turner alleged that Tom didn't consider his evidence and found him guilty without evidence, but Turner fails to present evidence showing anything more than that he didn't agree with the outcome of his hearing, which isn't enough to support a due process claim. *See, e.g.*, *Wilson v. Greetan*, 571 F. Supp. 2d 948, 955 (W.D. Wis. 2007) (A hearing officer "is not required to believe the prisoner in every instance or face liability for violating the prisoner's constitutional rights."). So I will grant summary judgment to the state defendants on this claim against Tom.

I granted Turner leave on due process claims against Primmer, Ray, and Haines for turning a blind eye to the disciplinary hearing's due process violations on appeal or in his later grievance. But because I have concluded that Turner's due process rights were not violated in his disciplinary hearing, his claims against these officials necessary fail as well.

### b. 2014 conduct report

Turner brings retaliation claims under the First Amendment and substantive due process claims against defendants Lebbeus Brown, Gardner, and Hanfeld for falsifying the 2014

conduct report and the evidence in support of it. The state defendants argue that Brown didn't author the conduct report. But it's clear that he advised Demo on the interpretation of the statements in the letter, so Brown has some personal responsibility the conduct report.

But Turner's retaliation and substantive due process claims regarding the 2014 conduct report fail for the same reasons as his similar claims about the 2011 conduct report. Both the First Amendment and substantive due process claims require that defendants retaliated against Turner for engaging in protected activity and that defendants didn't have a legitimate reason for the conduct report—even if that reason was mistaken. Demo admits in the conduct report that many of the quoted statements appear to be innocuous business management language. Even the statements about knowing "who's with them and who's against them" and how the men in the community are responsible for safety and protection are not obviously statements connected to gang activity, and might have a place in a discussion about a community outreach non-profit. But Turner used the "growth and excelleration" phrase that the gang-expert staffers say is code, it's clear that defendants—along with the rest of the WSPF decisionmakers— believe that Turner is a gang member, and that Turner has repeatedly been convicted of similar offense for gang communications. The underlying truth of what Turner intended with his letter isn't what matters; instead it's what defendants thought Turner intended. There simply isn't any evidence to raise a reasonable inference that defendants held any animus toward legitimate efforts to help others organize a non-profit, and that they did not sincerely believe that Turner was engaging in coded gang communication. So I will grant summary judgment to the state defendants on Turner's retaliation and substantive due process claims about this conduct report.

The thrust of Turner's procedural due process claim against hearing examiner Shannon-Sharpe is that she initially thought that the letter did not contain any coded gang communications, but that she changed her mind during the hearing after being given security threat group specialist Hanfeld's report, a document that Turner did not have a chance to see before or during the hearing. But the timing of the report is immaterial given that Turner is entitled only to informal process; he did not have the right to review all the evidence against him.

I also take Turner to be saying that Shannon-Sharpe based her ruling on a fabricated statement by Hanfeld that Turner admitted to being a Gangster Disciple; Turner says that Shannon-Sharpe said, "based upon this report, you admitted you are a gangster disciple, and the document is gang related. So I have no choice but to find you guilty." Even if Hanfeld fabricated Turner's admission, that point wasn't material because Turner's past gang affiliation was widely recognized. Shannon-Sharpe stated that the DOC "recognizes [Turner] as a confirmed member" of the Gangster Disciples, which tracks with all the other evidence in the case that the DOC believes Turner to be a Gangster Disciple. And even crediting Turner's account that Shannon-Sharpe changed her mind about the contents of the letter because of Hanfeld's report, that change wasn't caused merely by Turner's status as a gang member; she also stated that "based upon this report . . . the document is gang related." In other words, Shannon-Sharpe deferred to Hanfeld's opinion about the contents of the letter.

As was the case with the 2011 letters, the 2014 letter is not explicitly gang communication. But given the meager "some evidence" threshold for Turner's due process claim and the deference this court affords prison officials on matters of prison security, Shannon-Sharpe's reliance on Hanfeld's gang expertise is enough to grant summary judgment

39

to the state defendants on this claim. That conclusion also dooms the procedural due process claims against the officials who reviewed Turner's appeal and grievance.

## C. Eighth Amendment claims

### 1. Psychological care

Turner brings Eighth Amendment medical-care claims concerning treatment of his psychological problems while in long-term solitary confinement.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

The thrust of Turner's Eighth Amendment mental health claims is that he has a history of mental health problems and prescriptions for psychiatric medication, and that the WSPF

medical staff defendants—Johnson, Lemieux, Hoem, Mink, Sebranek, and Rubin-Asch—knew that prolonged solitary confinement would harm Turner's mental health, but they completely failed to provide him with treatment throughout his time at WSPF.

But the question for his Eighth Amendment claims isn't whether he had a history of mental health problems in the distant past, it's whether defendants consciously disregarded a problem at the time they were aware of it. And the medical evidence provided by the parties shows that Turner was not diagnosed with a serious mental problem at the start of his time at WSPF. Turner discusses his "diagnostic summary" upon entering WSPF in 2000: at that point he had a current diagnosis of Schizotypal Personality Disorder with paranoid and antisocial features, with additional past diagnoses. But that was Turner's first stint at WSPF. This case concerns Turner's second stint at WSPF, starting with his return to WSPF in 2010. The non-defendant doctor performing a mental health screen for Turner's transfer to WSPF stated that "Turner has not presented any evidence of significant mental illness in many years and has continued to function adequately off medication for many years as well." Dkt. 122-2, at 3.

Defendant psychologist Hoem conducted an intake review for Turner's transfer into WSPF. Hoem noted that the earlier diagnoses of Schizophrenia or Schizotypal Personality Disorder were only provisional and had been removed earlier because staff did not substantiate them. Turner told Hoem that he stopped taking psychotropic medication in 1993, and he "presented with no mental health complaints other than generalized depression or sadness about the loss of family members over the years." Dkt. 122, at 3. Both the doctor at the outgoing facility and Hoem at WSPF categorized Turner as "MH-0," meaning that he did not have documented mental health needs. Like any inmate, Turner could make requests for psychological treatment and he was seen on normal weekly PSU rounds. For the first several

41

years after his 2010 transfer to WSPF, Turner does not say that he suffered particular symptoms of mental illness or that he asked for treatment. So there is no evidence that defendants consciously disregarded his condition during this time.

Turner has filed a motion for leave to submit the expert report of Askari Moyenda, a doctor in psychology and law, a month past his deadline for doing so. Dkt. 113. I'm well aware of the difficulties that pro se litigants face in obtaining experts in these types of cases, so I'll grant his motion and allow him to submit the report. But defendants' objections to Turner's proposed findings relying on Moyenda's report are sound. Moyenda's report, Dkt. 113-2, is a two-page letter not notarized or sworn under penalty of perjury, and he doesn't include a curriculum vitae so that I can verify his credentials.

In any event, Moyenda's opinions do not directly support any of Turner's claims. Moyenda states that one is never fully cured of psychological disorders, and that solitary confinement is psychologically damaging. I take Turner to be arguing that this shows that defendants should have continued to treat him instead of giving him a MH-0 designation. But he cannot succeed on an Eighth Amendment claim unless he can show that he was actually suffering from a particular problem that defendants knew about and failed to help him with. As stated above, at least for the first several years of Turner's placement back at WSPF, he wasn't suffering from symptoms that needed treatment, nor did he ask for help from them, so he doesn't show that they consciously disregarded his needs. Moyenda also says that it would be inappropriate to diagnose someone using the "multi-axial" system organizing mental health diagnoses found in previous versions of the Diagnostic and Statistical Manual of Mental Disorders because the DSM-5, adopted in 2013, eliminated that system. But neither Moyenda

42

nor Turner point to any evidence suggesting that defendants continued to use the outdated system.

Turner says that in 2014 and 2015, he experienced "extreme bouts of Depression and Anxiety Attacks" but when he contacted PSU personnel they "consistently refused or failed to interact with [him]." Dkt. 147, at 14, at ¶ 107. Then, in late November 2015, Turner was part of a group complaint in which six inmates said that their placement in long-term solitary confinement was causing them psychological harm. Dkt. 148-9, at 68. Complaint examiner Ray (who is not a defendant on these claims) recommended dismissal, stating that she talked to defendant psychology supervisor Tracy Johnson, who told her that the six inmates "do not typically report mental health concerns nor do they display mental health difficulties." Id. at 89. Johnson also told Ray that Turner was incorrect when he claimed to be diagnosed with Schizotypal Personality Disorder, and that "Turner has requested clinical services in the past, but due to his continual inappropriate interactions with the clinician, it was determined not to be productive." Id. Although the grievance was not directly about Turner's alleged lack of treatment in 2014 and 2015, Turner says that Johnson's statement shows that at some point, PSU staff decided not to treat him.

In his proposed findings, Turner does not explain when he made his 2014–15 requests for treatment, who from the PSU responded, or how they responded. The state defendants explain PSU procedures for conducting rounds and making appointments; they don't directly rebut Turner's assertion with facts about his treatment. But my own review of the records show that PSU staff responded to Turner's requests.

In March 2014, Turner made a psychological service request discussing depression and anxiety; defendant Lemieux responded by noting that he had not expressed those concerns

during recent rounds but that she would talk to him further at the next rounds. Dkt. 122-1, at 176. Turner was asleep during the next rounds. *Id.* at 101. When Lemieux met with Turner the following week, Turner did not report any mental health concerns; instead he told Lemieux, "Don't ever stop at this door. I already told you that." *Id.* at 100.

In May and June 2014, Turner submitted more psychological service requests discussing depression and anxiety. *Id.* at 173 and 174. Lemieux said that they could talk during rounds and she suggested that Turner take an advanced in-cell coping skills program. *Id.* at 174. Lemieux met with Turner in late June and provided him with "brief supportive therapy utilizing active listening and empathy." *Id.* at 96. A non-defendant counselor met with Turner in August 2014 to respond to a request from Turner that is not in the medical record. *Id.* at 84–85. The report from that meeting states that Turner did not discuss his mental health concerns, but rather complained of his placement in segregation, with the counselor stating that Turner was argumentative and disrespectful. *Id.*

Turner's next psychological service request was in July 2015, saying that he was suffering from severe depression and anxiety, admitting that he hadn't "had the best interactions or the most productive interactions with PSU staff," and asking to be placed in a meditation program. Defendant psychologist Hoem responded that Turner was placed on the wait list for that program. Two weeks later, Turner followed with another request discussing anxiety and depression and complaining that PSU had not fixed those problems or prescribed him medication. *Id.* at 162. Hoem responded by referring him to psychiatry and stating that the PSU staff cannot prescribe medications. Turner was seen by a non-defendant psychiatrist. The psychiatrist's report says that Turner said that he did not request to meet with him and

he did not want to be prescribed medication. *Id.* at 142. In September 2015 Hoem enrolled him in a mindfulness group, which Turner attended.

Nothing in Turner's materials suggest that he believes that these records were fabricated. His vague statement that PSU staff refused to interact with him is not enough to create a genuine dispute of fact over whether these various meetings occurred, and nothing in the records suggest that any of the defendants acted with conscious disregard to his condition. So I will grant summary judgment to the state defendants on this portion of Turner's Eighth Amendment claims.

Turner says that in 2016, he provided an answer on an antisocial thinking program questionnaire stating that he believed that DOC staff had placed hits on him; I take him to mean that these answers shows that he was suffering from paranoia. A program services official emailed several other officials, including defendants Boughton, Winkleski, and Brown, stating that his statements were "somewhat concerning." Dkt. 148-37, at 1. But no one from PSU talked to him about it. Turner was not granted leave to proceed on psychological treatment claims against Boughton, Winkleski, or Brown, so their knowledge of the questionnaire is immaterial. Turner does not suggest that any of the defendants on these claims were aware of his questionnaire response, so this incident provides no evidence to supporting his claims against the PSU defendants.

But there is a period when Turner says that defendant Mink wouldn't follow through on scheduling a psychological appointment with him when he complained of depression and anxiety. The parties don't explain Mink's position at the prison, but it's clear that she is a PSU employee. In another case in this court, Mink stated that she is a psychological associate.

*See Burgess v. Mink*, No. 18-cv-527-jdp, Dkt. 100. I'll present the facts regarding this stretch of time in more detail.

On July 24, 2016, Turner submitted a psychological service request stating that he was "overcome with feelings of depression and anxiety," that he "really need[ed] to speak with someone" and that he thought that staff was keeping from completing the programs he needed to get out of administrative confinement. Dkt. 122-1, at 157. Defendant Mink wrote back, stating that Turner would be seen for a psychology appointment within two to three weeks. The PSU rounds notes state that defendant Sebranek saw Turner the next day and stated that Turner "chose not to engage with this clinician and turned down a puzzle packet. No mental health concerns." *Id.* at 72.

Mink stopped by Turner's cell the following three weeks on rounds, noting that Turner appeared to be asleep the first two weeks. *Id.* On August 17, 2016, Mink stated in the rounds report that Turner "claimed no mental health concerns at this time." *Id.* Mink also completed a "psychological services clinical contact" form for the same day, *id.* at 73, which I assume also memorialized the meeting between Turner and Mink during rounds. Mink stated that the reason for the meeting was "inmate request." They discussed Turner's frustration with not being placed in programming that he thought he should have given his status in HROP. Mink assessed Turner's mental status and did not note any problems.

The rounds log shows that defendant Lemieux met with Turner on September 23, 2016, and Turner reported feeling "not too good," but Lemieux reported not having mental health concerns about Turner. On an October 14 round, Lemieux reported that Turner wanted a referral to the Wisconsin Resource Center for coping skills. Lemieux told him to make a written request about this. Lemieux also stated that Turner reported "feeling depressed." *Id.* at 71.

46

In late October 2016, Turner filed another psychological service request, in which he referred to his July 24 request, noted that Mink had said an appointment would be scheduled within two to three weeks but that he "was never seen or spoken to." *Id.* at 153. Mink responded by saying that he was seen on rounds on "7-7-16" and that he said that he no longer wanted an appointment. *Id.* Turner is correct that this response doesn't make sense because July 7 predates Turner's July 24 psychological service request. The rounds log also does not show that Turner rejected an appointment on July 7; on that day, Mink stated that Turner appeared to be asleep during rounds. *Id.* at 72.

Turner followed with an administrative grievance. Dkt. 148-39, at 4. Ray, (who is not a defendant on Turner's psychological-care claims) recommended dismissing the grievance because Turner's PSU records showed that Mink met with him on August 17. *Id.* at 9. On appeal, Turner stated that the August 17 meeting was not a real appointment because he "did not waive his confidentiality to allow Ms. Mink to discuss his private clinical and psychological issues over the range in the presence of 23 other prisoners." *Id.* at 12. Turner lost that appeal. *Id.* at 14.

Turner says that he spoke with defendant Rubin-Asch in late March 2017 to talk about anxiety and depression causing in part by his belief that DOC staff was threatening his life. Rubin-Asch suspected that Turner was suffering from post-traumatic stress disorder and he asked Turner if he'd like to meet further to talk about it. But Turner says that neither Rubin-Asch nor anyone else followed up with him. His condition worsened to the point that in 2019, he attacked another inmate who he thought was working with DOC officials to harm him. He was prescribed a psychotropic medication, Zoloft, "to target sleep, anxiety and depressive symptoms." Dkt. 122-3, at 5. Months later he attempted suicide by overdoing on medication.

A significant portion of these events postdate the March 13, 2017 date of Turner's complaint. Turner is proceeding with another lawsuit, No. 19-cv-1001-jdp, that concerns most of these events. Those claims are not part of this lawsuit so I will not consider them further in this opinion. But I include those facts to show that Turner was eventually prescribed psychotropic medication for depression and anxiety.

Defendants contend that throughout his time at WSPF, defendants didn't violate his Eighth Amendment rights because Turner "only had any mental health needs since June 12, 2019" because his mental health categorization was changed following his prescription for psychotropic drugs. Dkt. 116, at 22. But Eighth Amendment medical care claims aren't limited to failures to treat an already diagnosed condition. They can also be supported by allegations that an official was presented with a medical problem and failed to arrange for further care aimed at identifying or treating the problem. Mink's July 2016 statement that she would schedule an appointment for Turner's complaints of depression and anxiety suggests that she was aware of a potential serious medical need.

The remaining question is whether Mink disregarded that problem. She responded to Turner's request by stating that a psychology appointment was scheduled for two to three weeks later. But months later when Turner filed another request, complaining about not getting an appointment, Mink stated, illogically, that he had turned down an appointment weeks before his July request.

Turner lost a grievance about the issue, with the examiner saying that Mink met with Turner on August 17, 2016. It's undisputed that this meeting occurred. But I take Turner to be saying that they did not actually discuss his mental health problems, because Mink refused to move the meeting from Turner's cell front to somewhere that they could confidentially

discuss his mental health symptoms. And two months later, even after receiving Turner's second request about his depression and anxiety, Mink did not schedule an appointment for him. Those facts raise a reasonable inference that Mink disregarded Turner's problem. I will deny the state defendants' motion for summary judgment on Turner's claim against Mink.

But I will not send the claim against Mink directly to trial. The claim against Mink overlaps substantially with the facts pertaining to Turner's 19-cv-1001-jdp case. I'll sever the claim against Mink from this case and consolidate it with the '1001 case, so Turner's related mental health claims can be litigated together.

### 2. Painful handcuffing

Turner says that because of his status on the lower rungs of the High Risk Offender Program, he was subject to a handcuffing policy when he left his cell: he was forced to take off his shoes and then put them back on only after his hands were handcuffed together and he was tethered to his cell door. Turner says that he was forced to do this for years, and the awkwardness of this process, particularly given that he wore cloth shoes that could not be "stepped into" without using his hands, caused him severe pain, damaged his skin, and eventually caused numbness in his hands. The state defendants contend that Turner cannot succeed on Eighth Amendment claims because prison staff had a legitimate penological purpose for the handcuffing procedure and because Turner has no evidence of defendants' malice toward him. They also contend that "incidental" pain from handcuffs cannot support an excessive force claim, citing *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006), a case in which an arrestee complained that a police officer applied handcuffs too tightly, causing pain and redness.

There's no question that prison staff has a legitimate penological interest in protecting themselves from prisoners during transfer, particularly the type of prisoner that would typically be housed in segregation at WSPF. But that doesn't resolve Turner's claims; they depend on the precise circumstances of the facts supporting those claims. And unlike *Tibbs*, this isn't an excessive force claim regarding a single incident in which a correctional officer put an arrestee's handcuffs on too tight during an arrest. I granted Turner leave to proceed on a claim that defendants subjected him to a condition of confinement that violated the Eighth Amendment. More specifically, Turner was subjected to an oft-repeated awkward cuffing procedure that he says causes him chronic medical problems like pain, numbness, skin damage, and nerve damage. Turner's proposed findings are enough to show that he was exposed to a substantial risk of harm.

But the problem for Turner is that he does not provide evidence showing that defendants were personally involved in a way that could lead a reasonable jury to conclude that they acted with conscious disregard to the problem. To hold defendants individually liable, plaintiff must show how they were personally involved in disregarding an excessive risk to his health or safety. *Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012).

The allegations in Turner's complaint were vague: he said that defendants Boughton, Haines, Hermans, Broadbent, Brown, and Kool created or enforced the handcuffing policy, which I concluded for screening purposes were enough to support a claim that they needlessly inflicted pain upon him. Dkt. 31, at 21. A supervisor can be liable under the Eighth Amendment for "personally devis[ing] a deliberately indifferent policy that caused a constitutional injury," *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998), or for

"facilitat[ing]" or "turn[ing] a blind eye" toward the problem, *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

At summary judgment, defendants have provided a copy of the handcuffing policy itself, Dkt. 120, which explains that inmates must "step into" their shoes while handcuffed, tethered, and at least sometimes to leg restraints as well. *Id.* at 4. But there's nothing on the face of this policy that suggests that it would harm inmates. Turner says that the policy was changed because of his lawsuit. It's undisputed that WSPF's cuffing policy was changed sometime after Turner filed his lawsuit to allow an inmate to put shoes on before being cuffed and tethered, but Turner doesn't provide any proof that it was changed because of the lawsuit, nor is the policy change itself enough to raise a reasonable inference that any of the defendants consciously disregarded harm caused by the previous policy.

Turner says that the policy harmed him in practice, but he does not explain how any of the defendants were involved in consciously disregarding the problem. For instance, he does not detail any specific instances in which one of the defendants saw him painfully struggling with putting his shoes on and failed to do something that could have helped him. His proposed findings in support of this part of his claims are meager. He says that he sent letters to various prison officials asking for a "soft cuff restriction," including some of the defendants, but he doesn't explain when he did this or how they responded, other than to note an administrative grievance he filed, No. WSPF-2014-6112. *See* Dkt. 148-36. In that grievance, he doesn't explain how any of the defendants harmed him either.

Two defendants were involved in the processing of Turner's grievance, which I considered to be the second aspect of Turner's handcuffing-policy claims. Complaint examiner Ellen Ray stated that Turner had written to the Health Services Unit a week earlier about his

injuries, with the HSU responding to write back if he wished to be seen by medical personnel. Ray recommended dismissing the complaint, concluding that Turner would have to resolve the problem by getting a medical restriction from the HSU. *Id.* at 3. Defendant Boughton adopted Ray's recommendation and dismissed the grievance. *Id.* at 4. That dismissal doesn't show conscious disregard; it's entirely appropriate for non-medical grievance-processing staff to delegate medical issues to the medical staff. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

In his brief, Turner says that before his grievance, his request for soft cuffs was denied by the prison's "Special Needs Committee." But Turner doesn't provide any findings of fact explaining this argument. He includes a Special Needs Committee ruling from a month after his grievance in which the committee stated that his request was denied because he didn't have a medical diagnosis. Dkt. 148-36, at 10. Turner doesn't explain what was incorrect about that decision, and in any event, none of the officials serving on the committee are defendants on Turner's handcuffing-policy claims.

Courts often observe that summary judgment requires the party with the burden of proof to "put up or shut up," pointing to evidence from which a reasonable jury could find in its favor of each element of its claim. *See, e.g.*, *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020). Turner presents enough evidence to show that he was injured by the handcuffing policy, but he fails in his burden to show that any of the defendants named in the handcuffing-policy claims violated his rights. So I will grant summary judgment to the state defendants on these claims.

### 3. Long-term solitary confinement

I granted Turner leave to proceed on individual- and official-capacity claims against Jess, Wall, Boughton, Hermans, Haines, Kartman, Sweeney, and Winkleski for subjecting him more generally to unconstitutional conditions of confinement over the last several years in long-term solitary confinement: he alleged that the segregation cells are extremely loud, with surrounding prisoners constantly screaming and kicking cell doors and walls, they are illuminated the entire day, he suffers what he calls "sensory deprivation" because the doors are solid and there is no view of the outside, there are severe restrictions on reading materials, personal possessions, and phone calls, he gets only four hours of sleep a night, and he received no psychological care for several years.

Under the Eighth Amendment, prisoners are guaranteed humane conditions of confinement for their health and safety. *Rice ex rel. Rice v. Corr. Med. Serv's*, 675 F.3d 650, 664 (7th Cir. 2012) ("Incarcerated persons are entitled to confinement under humane conditions which provide for their 'basic human needs.'"). For example, prisoners must receive adequate food, clothing, and shelter, *Farmer*, 511 U.S. at 834. A claim that a prisoner's conditions of confinement violate the Eighth Amendment requires the prisoner to prove two things: (1) the adverse condition is sufficiently serious; and (2) the prison official has consciously disregarded that condition. *Rice*, 675 F.3d at 664– 65. For an adverse condition to be sufficiently serious, it must be "extreme," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and it must deprive the prisoner of a "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834.

At summary judgment, Turner does little to support his allegations that the conditions he faced at WSPF were unconstitutionally harsh. His main contentions are that the several years' worth of continuous segregation has been psychologically crippling, and that he should

not have been kept in segregation given the diagnoses he had received years before coming back to WSPF in 2010.

This court has long recognized that prison officials can violate the Eighth Amendment by housing a mentally ill prisoner in solitary confinement for long periods of time. *See Jones 'el v. Berge*, 164 F. Supp. 2d 1096, 1116 (W.D. Wis. 2001) (when conditions of segregation "are so severe and restrictive that they exacerbate the symptoms that mentally ill inmates exhibit," this may result in cruel and unusual punishment). And our society is developing a better understanding of the danger that social isolation poses to prisoners. *See, e.g., Davis v. Ayala*, 576 U.S. 257, 286–90 (2015) (Kennedy, J., concurring) ("There are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular.").

But as defendants point out, Turner's conditions-of-confinement claim must be considered in the context of his status at the time. Harsh and isolating conditions may not violate the Eighth Amendment if there were no "feasible alternatives." *Rice*, 675 F.3d at 666. *See also Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994) ("Whether [segregation] does in fact violate the Eighth Amendment depends on the duration and nature of the segregation and the existence of feasible alternatives."); *Meriwether v. Faulkner*, 821 F.2d 408, 416–17 (7th Cir. 1987) ("Obviously influencing whether prolonged segregation constitutes cruel and unusual punishment is the existence of feasible alternatives."). Turner suggests that he should have been sent out of state, but the state defendants explain that in 2014 and 2015, DOC attempted to have Turner sent to three other states in the hope he could adjust to the general population in those states, and those states would not accept him.

54

Here, prison officials have identified Turner as someone who needs to be kept out of general population because he continues to operate as a gang leader. Turner says that he is not a gang leader and so he does not deserve to be placed in administrative confinement. But this is not an argument that there is a feasible alternative to his current placement, given the ACRC's decision about him being a threat to security. And as discussed above, Turner was not diagnosed with a serious mental illness during the events of this case, which include the stint at WSPF starting in 2010. With the exception of his claim against Mink for failing to follow up on his request for further treatment for depression and anxiety in 2016, I am granting summary judgment to both sets of defendants on Turner's claims in this lawsuit regarding inadequate mental health care. His claims about his current psychological care are being litigated in another lawsuit. There isn't any indication that any of the defendants on the general conditions-of-confinement claims knew that Turner's placement in segregation was exacerbating a mental illness. So he cannot maintain a claim based solely on the theory that his lengthy segregation has damaged his mental health.

As for the other aspects of the conditions Turner raised in his complaint, those don't support an Eighth Amendment claim either, whether I consider them in isolation or in combination with the length of time he has served in solitary confinement. The two problems for Turner with these allegations are that he (1) mostly frames them in relation to the conditions and privileges general-population inmates have, which is not relevant to the Eighth Amendment inquiry; and (2) he fails in his burden to set forth facts explaining the basis for his claims.

For instance, Turner says that his cell is constantly illuminated but he doesn't explain this in any further detail; defendants say that a night light is on. He alleged that inmates on

his segregation unit were exceptionally loud when he was first moved back to WSPF, causing him a headache, but he doesn't provide any additional proposed findings about that event or suggest that this was the norm over the several years at issue here. He says that he gets only four hours of sleep. But he doesn't directly tie that to the illumination or noise, explain away other reasons for his lack of sleep, or say what he has done to inform defendants of his problem. He says that his cell gets hotter in the summer and colder in the winter than the general population cells, but he doesn't explain how extreme the temperatures are. He says that he has limited access to outdoor exercise—about two and one-half hours a week, but he does not address the additional two and one-half hours of weekly indoor recreation he receives. *See Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988) (concluding that district court's injunction mandating five weekly hours of out-of-cell recreation time was reasonable to uphold Eighth Amendment). And he says that he is not allowed to participate in out-of-cell religious services, but he wasn't allowed to proceed on any claims about his religious rights. At the summary judgment stage, Turner has the burden of producing evidence that could prove his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). His failure to explain the severity of his conditions or how they harmed him dooms those aspects of his claims; on this sparse record, no reasonable jury could conclude that defendants violated his Eighth Amendment rights with the conditions of his confinement.

CONCLUSION

I am granting summary judgment to defendant Wall on all of the claims against him and to the state defendants on all of the claims against them with the exception of Turner's Eighth Amendment medical care claim against defendant Mink for failing to follow up on his

request for further treatment for depression and anxiety in 2016. That claim will be severed

from this case and consolidated with Turner's '1001 lawsuit. Because I am dismissing all of the

claims remaining under this case number, I will direct the clerk of court to enter judgment and

this case will be closed.

ORDER

IT IS ORDERED that:

1. Plaintiff Glenn Turner's renewed motion for recruitment of counsel, Dkt. 111, is DENIED without prejudice.

2. Plaintiff's motion for reconsideration of the court's March 9, 2020 opinion, Dkt. 110, is DENIED.

3. Plaintiff's first motion to compel discovery, Dkt. 133, is DENIED as moot.

4. Plaintiff's second motion to compel discovery, Dkt. 138, is DENIED.

5. Plaintiff's motion for defendants to submit prison policies to the court, Dkt. 137, is DENIED.

6. Plaintiff's motions to compel discovery and for sanctions, Dkt. 168 and Dkt. 170, are DENIED.

7. The parties' motions for extensions of time to file summary judgment responses or replies, Dkt. 132; Dkt. 154; Dkt. 155, are GRANTED.

8. Plaintiff's motion to submit a late expert report, Dkt. 113, is GRANTED.

9. The state defendants' motion for summary judgment, Dkt. 115, is GRANTED in part and DENIED in part.

10. Defendant Wall's motion for summary judgment, Dkt. 126, is GRANTED.

11. Turner's surviving claim against defendant Mink is SEVERED from this case and JOINED with Turner's claims in case No. 19-cv-1001-jdp. The clerk of court is directed to add Mink as an active defendant in the '1001 case and docket this order in that case.

12. The clerk of court is directed to enter judgment accordingly and close this case.

Entered March 30, 2021.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge